William Kasel, Pro Se

946 3rd Street

Hermosa Beach, CA 90254

Telephone: (415) 818-6348

Email: wkasel@gmail.com

FILED

CLERK, U.S. DISTRICT COURT

6/30/2026

CENTRAL DISTRICT OF CALIFORNIA

BY_____jji_____DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| WILLIAM KASEL, an individual, | Case No. 2:26-cv-04310-RGK (DSRx) |
| Plaintiff, | |
| v. | FIRST AMENDED COMPLAINT FOR DAMAGES AND |
| NATIONAL AG FINANCE INC., a Delaware corporation; JOSHUA J. MITCHEY, an individual; | DECLARATORY RELIEF |

and DOES 1 through 10, inclusive,        [Demand for Jury Trial]

Defendants.

## GENERAL ALLEGATIONS

**The Parties**

1. Plaintiff WILLIAM KASEL ("Plaintiff" or "Kasel") is an individual residing in Hermosa Beach, Los Angeles County, California.

2. Defendant NATIONAL AG FINANCE INC. ("NAF" or "Defendant") is a Delaware corporation with its principal place of business at 5500 Greenwood Plaza Blvd, Suite 130, Greenwood Village, Colorado 80111. NAF is a technology-driven company that markets and brokers agricultural loans; it does not underwrite or fund those loans itself. NAF's business and competitive differentiator is the proprietary software platform through which it sources, processes, and services loan applications.

3. Defendant JOSHUA J. MITCHEY ("Mitchey") is an individual and the Chief Executive Officer and co-founder of NAF. Mitchey personally recruited Plaintiff and requested professional references before engaging Plaintiff. Mitchey personally directed NAF's IT administrator to create a company email account for Plaintiff (william@nationalag.com) and provided Plaintiff with a "CTO" signature block and title. Mitchey personally introduced Plaintiff to external business partners as "NAF's CTO." On August 26, 2025, Mitchey asked Plaintiff to represent NAF on partner calls as "fractional CFO" and asked Plaintiff "what time do you usually hit the desk?" Mitchey personally processed wire transfer payments to Plaintiff throughout the engagement and personally acknowledged late payments in text messages, promising to "make it priority." On February 4, 2026, Plaintiff texted Mitchey directly pleading for payment of outstanding wages, stating he would miss rent. Mitchey did not respond. The following day, NAF sent a retaliatory cease and desist letter on which Mitchey was personally copied. Mitchey is sued in his individual capacity.

4. Ashley C. Seeley ("Seeley") is, and at all relevant times was, NAF's Chief Legal Officer, Chief Operating Officer, and Secretary, and is NAF's counsel of record in this action. Seeley has held herself out in NAF communications, including by NAF signature block, as a Co-Founder of NAF. Seeley is an

attorney admitted to the California State Bar (Bar No. 270530). Seeley is not named as a defendant in this First Amended Complaint; her conduct is alleged herein solely in her capacity as NAF's officer and agent, and her knowledge and conduct are imputed to NAF. On NAF's behalf, Seeley requested, reviewed, revised, and finalized the Consulting Agreement and the Confidential Information and Invention Assignment Agreement (CIIAA), including providing the form CIIAA containing the post-engagement restraints challenged herein and inserting Colorado as the choice-of-law jurisdiction in a previously blank template field. Seeley authored the February 5, 2026 cease and desist letter on NAF's behalf, and personally denied Plaintiff's requests for timely payment of outstanding wages on two separate occasions despite Plaintiff's disclosure that the delay would cause him to miss rent. Plaintiff is informed and believes, and on that basis alleges, that Seeley's professional practice is publicly held out as that of a specialist California employment lawyer in matters including misclassification, unpaid wages, retaliation, and non-compete and non-solicitation restraints. Seeley's specialist knowledge of California employment law, her role in drafting and finalizing the Agreement and the CIIAA, and her knowledge of the facts of Plaintiff's working relationship with NAF are imputed to NAF and support an inference that NAF's classification of Plaintiff and the related Labor Code violations were knowing and willful.

5. Plaintiff is ignorant of the true names and capacities of Defendants DOES 1 through 10, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this complaint to allege the true names and capacities of these defendants when ascertained. Plaintiff is informed and believes, and thereon alleges, that each fictitiously named defendant is responsible in some manner for the occurrences herein alleged.

**Jurisdiction and Venue**

6. This action was originally filed in the Superior Court of the State of California, County of Los Angeles, Southwest District, Case No. 26TRCV00817, on March 6, 2026. Defendant NAF removed this action to this Court on April 23, 2026, asserting diversity jurisdiction under 28 U.S.C. §1332.

7. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a). Complete diversity of citizenship exists: Plaintiff is a citizen of California; Defendant NAF is a citizen of Delaware, its State of incorporation, and of Colorado, its principal place of business; and Defendant Mitchey is a citizen of Colorado. The amount in controversy exceeds $75,000, exclusive of interest

and costs. By Order entered June 23, 2026 (ECF No. 37), the Court denied Plaintiff's motion to join Ashley C. Seeley as a defendant and denied remand, and granted Plainti'' leave to file this First Amended Complaint. This First Amended Complaint is filed pursuant to, and conforms to, that Order; Plaintiff asserts only the causes of action set forth herein and does not reassert every claim for which leave was granted. Plaintiff does not waive, and expressly reserves, all rights to seek review of the Court's joinder and remand rulings upon entry of final judgment.

7A. This Court has personal jurisdiction over Defendant Mitchey under Calder v. Jones, 465 U.S. 783 (1984), and Walden v. Fiore, 571 U.S. 277 (2014), based on Mr. Mitchey's purposeful direction of conduct toward California: (a) Mr. Mitchey personally negotiated and authorized the Consulting Agreement with Plaintiff, a California resident, knowing that the contractual relationship would be performed by a California-based worker; (b) Mr. Mitchey personally directed Plaintiff's work performance, including by communicating with Plaintiff at his California address, by making personnel and payment decisions affecting a California-based worker, and by introducing Plaintiff to NAF's third-party vendors and lending partners while Plaintiff resided in and worked from California; (c) Mr. Mitchey personally caused tortious effects in California

by authorizing the February 5, 2026 cease-and-desist letter directed to Plaintiff at his California residence and by personally directing the wage non-payment that constitutes the substance of the wage-related claims; and (d) Mr. Mitchey's contacts with California are sufficient to establish specific personal jurisdiction under the purposeful-direction test, as the claims at issue arise directly from Mr. Mitchey's California-directed conduct.

8. This Court has personal jurisdiction over Defendants NAF and Mitchey. NAF transacted substantial business in California by recruiting and hiring a California-resident worker and directing that work be performed in California. Mitchey personally communicated with Plaintiff in California and directed work to be performed in California, as further alleged in Paragraph 7A above.

9. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1441(a). A substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, where Plaintiff resides and performed the services at issue, and this District embraces the Superior Court of California, County of Los Angeles, from which this action was removed.

**FACTUAL ALLEGATIONS**

## The Consulting Agreement

10. On or about April 30, 2025, Plaintiff sent NAF's CEO a draft agreement. NAF's Chief Legal Officer, Ashley C. Seeley, Esq., reviewed the draft, made revisions on NAF's behalf — including inserting Colorado as the choice-of-law jurisdiction in a previously blank template field and providing the form Confidential Information and Invention Assignment Agreement (the "CIIAA") containing additional restraints of trade — and returned a revised version. The parties executed the final Consulting Agreement ("the Agreement") on or about May 2, 2025, under which Plaintiff was to provide technology services for NAF's agricultural lending platform.

11. The Agreement provided for compensation at a rate of $200 per hour, payable in 50-hour increments upon Plaintiff's submission of invoices. Section 4 of the Agreement expressly provides that upon termination, "Consultant shall be paid for any portion of the Services that have been performed prior to the termination."

12. The Agreement classified Plaintiff as an "independent contractor" under Section 5 and included both a during-engagement non-competition provision

(Section 8 of the Consulting Agreement) and, through the CIIAA attached as Exhibit D, additional 12-month post-engagement non-solicitation and customer non-interference restraints — the latter restraints having been added by NAF through provision of the CIIAA which was not part of Plaintiff's original Clerky template draft.

13. The Agreement also included a Confidential Information and Invention Assignment Agreement ("CIIAA"), a non-solicitation provision, and a customer non-interference provision — instruments characteristic of employment relationships, not independent contractor engagements.

14. The Agreement contained a 15-day cure provision in Section 4, requiring written notice and opportunity to cure before either party could claim breach. At no time during the engagement did NAF issue a cure notice to Plaintiff. The Agreement contains no arbitration clause; all disputes are subject to judicial resolution.

**The Working Relationship Was Employment in All But Name**

15. Despite the "independent contractor" label in the Agreement, the actual working relationship between Plaintiff and NAF constituted an employment relationship under the California ABC Test as codified in Labor Code §2775 (Assembly Bill 5).

16. Prong A — Control and Direction: NAF exercised pervasive control over Plaintiff's work. NAF assigned Plaintiff the title of Chief Technology Officer ("CTO"). NAF's CEO personally directed an IT administrator to create Plaintiff's company email address (william@nationalag.com) and provided a CTO signature block. NAF placed Plaintiff's name, headshot, and CTO title on its company website alongside other members of the executive leadership team. During active development phases of the engagement, including the period leading up to NAF's platform launch, Plaintiff regularly attended NAF's team meetings, the frequency of which varied with the development cycle — at times several days per week, and during intensive periods nearly every workday, including days between Christmas and New Year's — at which NAF set the agenda, assigned development tasks, directed priorities, and integrated Plaintiff into the operational cadence of its executive team. NAF introduced Plaintiff to its lending partners, including X-Caliber, as NAF's CTO. On August 26, 2025, NAF's CEO asked Plaintiff to represent the company as "fractional CFO" on

external partner calls and asked Plaintiff "what time do you usually hit the desk" — treating Plaintiff as an employee with expected work hours. Plaintiff personally created and administered substantially all of the critical infrastructure used by NAF in connection with the platform — including the Vercel production environment, Supabase production database, GitHub repositories, and Cloudflare configuration — and granted NAF's CEO and team delegated administrative access on those accounts. Within NAF's day-to-day operational hierarchy, Plaintiff and the CEO held the senior-most technical administrator privileges. Plaintiff was integrated into NAF's organizational structure as a member of the executive leadership team, carrying titles, access levels, and responsibilities characteristic of employment, not independent contracting.

17. Prong B — Usual Course of Business: The services Plaintiff performed were not merely within, but were the core of, NAF's usual course of business. NAF does not underwrite or fund agricultural loans; it markets and brokers them, and its entire business and only competitive differentiator is the technology platform through which it sources and processes loan applications faster than its competitors. Plaintiff built that platform. It comprises approximately 197,000 lines of code across 1,106 files and processed

approximately $8.4 million in loan applications across 28 borrower applications. NAF has treated the platform as its central, proprietary asset. A company whose business is its software platform cannot show that building and operating that platform is "outside" its usual course of business — that platform is the very thing NAF does. Plaintiff's services therefore fall squarely within NAF's usual course of business, and NAF cannot satisfy Prong B of the ABC test.

18. Prong C — Independent Business: Plaintiff was not customarily engaged in an independently established CTO-for-hire consulting practice of the same kind and scope as the work performed for NAF. Plaintiff maintains a public-facing professional online profile, but during the NAF engagement and in the period immediately preceding it, Plaintiff was not contemporaneously operating an active CTO-for-hire consulting practice serving multiple clients. During the relevant period, Plaintiff's professional identity in the marketplace was operationally integrated into NAF, such that third parties recognized Plaintiff as NAF's executive rather than as an independently established CTO consultant available for hire. Plaintiff did not advertise, market, or solicit business specific to agricultural lending technology, and did not perform CTO-for-hire consulting services for any other client of comparable kind and scope during the

engagement. Plaintiff is also a co-founder of Loop, an unrelated e-commerce health business; Loop is not in the agricultural lending technology field, did not compete with NAF in any market or business line, and Defendant Mitchey was personally aware of Loop at all relevant times. Defendant Mitchey, acting on behalf of NAF, initiated contact with Plaintiff via the Upwork platform on or about April 26, 2025. The engagement that followed arose from NAF's recruitment of Plaintiff; Plaintiff did not solicit NAF, did not propose the engagement, and did not advertise services specific to agricultural lending technology.

19. NAF fails all three prongs of the ABC Test. Plaintiff was an employee of NAF as a matter of California law, regardless of the contractual label.

**Payment History and NAF's Failure to Pay Final Wages**

20. Between April 2025 and January 2026, NAF paid Plaintiff a total of $92,574 across approximately nine payments. These payments were frequently late, a fact NAF's CEO attributed in writing to banking problems with NAF's financial institution (BMO).

21. Plaintiff voluntarily resigned from his engagement with NAF on January 28, 2026, providing written notice. In his resignation communication, Plaintiff expressed gratitude and respect for the NAF team, completed all outstanding Priority 0 tasks, and provided a link to the full project board for transparency. Plaintiff had voluntarily stopped tracking his hours after exceeding 80 hours in the final billing period to avoid running up NAF's costs unnecessarily, and self-imposed a billing cap of $18,600 for the final invoice despite having worked additional uncompensated hours. Plaintiff also offered to amortize payments to accommodate NAF's cash flow.

22. NAF's CEO responded on January 28, 2026: "I agree. Let's handoff the project as smoothly as possible. Vani and/or Ashley will reach out to you shortly." NAF's Chief Operating Officer Ashley C. Seeley and product lead Vani Oza subsequently organized a formal multi-day "Development Handover" process, including scheduled meetings, a handover spreadsheet listing all services to be transitioned, and specific technical tasks (Supabase, Cloudflare, and iSoftPull access transfers). Plaintiff agreed in good faith and performed approximately 24 hours of transition work over multiple days at NAF's direction.

23. At the time of resignation, NAF owed Plaintiff $12,400 in invoiced and unpaid wages for services Plaintiff personally performed and billed. Although Plaintiff's February 6, 2026 demand letter had requested $15,600, the $3,200 difference represented an amount NAF owed directly to Ross Ragsdale — a third-party vendor who invoiced NAF and was paid by NAF directly, and whose compensation never passed through Plaintiff — which Plaintiff does not claim as his own. Plaintiff's unreimbursed business expenses, including amounts Plaintiff paid out of pocket on NAF's behalf, are sought separately under the Fourth Cause of Action (Labor Code §2802) and are not included in this figure. Plaintiff also performed approximately 24 hours of post-resignation transition and handover work at NAF's direction — including handover meetings, written documentation, and operational task transfers — but did not invoice NAF for that work, choosing instead to facilitate a goodwill transition, and does not seek compensation for it in this action. Plaintiff pleads his contract and wage remedies for these unpaid wages in the alternative and does not seek duplicative recovery of the same compensation.

24. Throughout the engagement, Plaintiff had accommodated NAF's recurring payment delays in good faith, accepting late payments without threatening to withhold services or cease work. Following resignation, Plaintiff again

attempted to work cooperatively with NAF on a payment timeline, proposing that payment be made on or about February 7, 2026. A dispute arose regarding the payment date — whether February 7 or February 16, 2026. Plaintiff informed NAF that he needed the outstanding wages to meet his basic living expenses, including rent, and that the delay would cause him to miss his rent payment. NAF's CLO Ms. Seeley denied Plaintiff's request for timely payment on two separate occasions.

25. NAF has not paid any portion of Plaintiff's final wages. No payment has been made as of the date of this First Amended Complaint. As a direct result of NAF's refusal to pay, Plaintiff suffered immediate financial hardship including inability to meet basic housing obligations.

**NAF's Retaliatory Cease and Desist Letter**

26. At approximately 12:30 a.m. Pacific time on February 6, 2026, NAF's Chief Legal Officer and co-founder Ashley C. Seeley sent Plaintiff a six-page cease and desist letter dated February 5, 2026 (the "C&D"). The C&D was sent via email to both Plaintiff and Plaintiff's spouse. NAF's CEO Joshua J. Mitchey

was copied on the email, confirming his knowledge and approval of the retaliatory communication.

27. The C&D falsely accused Plaintiff of "sabotage" and threatened claims under the Computer Fraud and Abuse Act (18 U.S.C. §1030). The predicate act for this accusation was an inadvertent change to delegated user permissions on Plaintiff's personal Vercel account. The Vercel account, and substantially all third-party vendor and SaaS accounts used by NAF in connection with the platform — including without limitation Vercel, Supabase, GitHub, Cloudflare, and Sentry — were originally created by Plaintiff under his personal credentials and registered and maintained in Plaintiff's name during the engagement. While certain accounts were updated during the engagement to add NAF's payment methods, account ownership of record remained with Plaintiff throughout, billing notifications continued to be addressed to Plaintiff in his personal capacity, and Plaintiff continues — as recently as the weeks preceding the filing of this First Amended Complaint — to receive non-payment notifications addressed to him personally for the very services NAF is presently using to operate its business. NAF never reimbursed Plaintiff for the expenses Plaintiff personally incurred and did not transition ownership of any of these accounts to NAF entities. As part of the post-resignation transition, Plaintiff was in the

process of separating himself from the Vercel account he owned when delegated user permissions were unintentionally affected. Plaintiff immediately communicated to NAF's CEO on February 5, 2026 that the change was accidental: "I was trying to remove myself from the account, if any access changed it was accidental, not intentional. That's not who I am." No NAF data was lost, deleted, or compromised. No service interruption to end-users occurred. The disruption to delegated permissions lasted approximately 2.5 hours before access was restored.

28. The C&D demanded the return of all $101,761 paid by NAF over the course of the engagement — comprising $92,574 paid to Plaintiff for his services, $6,187 paid to Plaintiff's spouse Megan Kasel for her separate work for NAF, and $3,000 paid by NAF directly to a third-party vendor (Ross Ragsdale) — for nine months of completed work that NAF accepted without objection and upon which NAF continues to operate its lending business. The demand sought the return of payments that Plaintiff did not personally receive and could not personally return.

29. The term "sabotage" was previously used by NAF's CEO Mitchey as a joke in a text message to Plaintiff on October 8, 2025 ("Corporate sabotage lol"), undermining the gravity of its subsequent use as a legal threat.

30. Plaintiff responded to the C&D with a demand letter on February 6, 2026, requesting payment of $15,600 in outstanding compensation and raising the misclassification issue. Plaintiff set a response deadline of February 10, 2026. NAF provided no substantive response by that deadline.

31. The pattern of NAF's conduct demonstrates willful and retaliatory intent: (a) NAF accepted and retained Plaintiff's work product for nine months without complaint; (b) Seeley personally represented Plaintiff's work to NAF's most significant lending partner, X-Caliber, as late as January 2026, in substance praising the platform Plaintiff built as "pretty spiffy"; (c) only after Plaintiff resigned and demanded payment of outstanding wages did NAF fabricate accusations of "sabotage" using language the CEO had previously used as a joke; (d) NAF demanded return of all prior compensation rather than pay $12,400 in outstanding wages; and (e) NAF accused Plaintiff of violating the federal Computer Fraud and Abuse Act, a criminal statute, over a 2.5-hour,

zero-damage incident on Plaintiff's personal account. This escalating retaliation was designed to intimidate Plaintiff into forfeiting his legal rights.

32. NAF has never filed any civil or criminal complaint regarding the Vercel incident. No law enforcement referral has been made. NAF's agricultural lending platform, designed and principally built by Plaintiff, has been continuously operational since the alleged incident. NAF continues to run paid advertising on Meta platforms directing potential borrowers to the platform Plaintiff built, confirming that no damage occurred and the CFAA threat was pretextual. On information and belief, NAF continues to operate that platform and to derive material economic benefit from it.

33. On February 4, 2026, as part of the Development Handover, Plaintiff invited josh@nationalag.com, vani@nationalag.com, ashley@nationalag.com, and NAF's replacement development team to the Supabase production database as new administrators. All invitations remained in "Pending" status because the invitees never accepted them. Plaintiff's affirmative efforts to transfer database access to NAF's team are inconsistent with the "sabotage" accusation in the C&D and confirm that the Vercel incident was accidental.

Ms. Seeley's Role as NAF's Officer and Agent

34. Ms. Seeley's involvement in the conduct alleged herein, in her capacity as NAF's officer and agent, is extensive and direct. In a sworn declaration filed in this Court on April 23, 2026 (Dkt. 3), Seeley confirmed under penalty of perjury that she simultaneously serves as NAF's Chief Legal Officer, Chief Operating Officer, Secretary, and litigation counsel.

35. As CLO, Seeley personally reviewed, revised, and finalized the Consulting Agreement, including. (a) accepting and maintaining the "independent contractor" classification in Section 5 despite knowing, as a California-barred attorney, that the ABC Test applies to California workers regardless of contractual labels; (b) attaching the form CIIAA (Exhibit D to the Consulting Agreement), which contained 12-month post-engagement non-solicitation and customer non-interference restraints that did not appear in Plaintiff's original draft, all of which are void under California Business and Professions Code §16600; and (c) inserting Colorado as the choice-of-law jurisdiction into a previously blank template field, deliberately selecting a non-California jurisdiction notwithstanding Plaintiff's California residency and the California

performance of the Services, in attempted circumvention of California's worker protection statutes, in violation of Labor Code §925.

36. As CLO, Seeley personally authored the February 5, 2026 cease and desist letter accusing Plaintiff of violating the federal Computer Fraud and Abuse Act, a criminal statute, an accusation she knew or should have known lacked legal merit given the absence of any cognizable damages or unauthorized access. In or about mid-to-late January 2026 — approximately three weeks before signing the February 5, 2026 cease and desist letter — Seeley participated in a video meeting with NAF's most significant lending partner, X-Caliber. The meeting was attended by Plaintiff, NAF's CEO Defendant Mitchey, Seeley, and approximately seven to eight X-Caliber personnel. During that meeting, Seeley personally represented to X-Caliber, in substance and in words to the effect of "wait until you see what he's built — it's pretty spiffy if I do say so myself," that Plaintiff's work product was of high quality. This contemporaneous executive communication — made by Seeley directly to NAF's most important business partner in the presence of multiple witnesses — contradicts the factual premise of the C&D's "materially deficient" allegations and confirms that the C&D's accusations against Plaintiff's work product were fabricated for retaliatory purposes. The recording and AI-generated transcription of this

meeting are stored on NAF's Microsoft 365 tenant and remain within NAF's exclusive possession, custody, and control.

37. As COO, Seeley personally denied Plaintiff's requests for timely payment of outstanding wages on two separate occasions, despite Plaintiff's disclosure that the delay was causing him to miss rent payments.

38. Ms. Seeley acted at all relevant times as NAF's Chief Legal Officer, Chief Operating Officer, and agent. As a California-barred attorney holding multiple executive positions at NAF, she had actual knowledge of California's employment laws and the legal consequences of misclassifying a worker. Her knowing conduct in reviewing, revising, and maintaining the misclassifying Agreement while preserving the contractor label is imputed to NAF and establishes that NAF's classification of Plaintiff, and the related violations alleged herein, were knowing and willful.

**NAF's Willful Misclassification Scheme**

39. NAF's misclassification of Plaintiff was willful within the meaning of Labor Code §226.8. NAF's Chief Legal Officer, Ashley C. Seeley (CA Bar

#270530), is an attorney admitted to the California Bar. Ms. Seeley reviewed, revised, and finalized the Consulting Agreement on behalf of NAF, including accepting and maintaining the independent contractor classification in Section 5 and providing the form CIIAA (Exhibit D) which contained additional 12-month post-engagement non-solicitation and customer non-interference restraints not present in Plaintiff's original Clerky template draft. As a California-barred attorney, Ms. Seeley knew or should have known that: (a) classifying a worker as an independent contractor while assigning a C-suite title, company email, and mandatory meeting schedule was inconsistent with independent contractor status under California law; (b) the ABC Test applies to California workers regardless of contractual labels; and (c) the inclusion of a CIIAA, non-compete clause, and non-solicitation provision are hallmarks of an employment relationship, not an independent contractor engagement. Further evidence of NAF's knowledge of the misclassification risk appears in the operative agreement itself: CIIAA Section 12(e), embedded in the Severability provision, expressly anticipates the possibility that "any court or government agency of competent jurisdiction determines that, notwithstanding the terms of the Consulting Agreement specifying Consultant's Relationship with the Company as that of an independent contractor, Consultant's provision of services to the Company is not as an independent contractor but instead as an

employee under the applicable laws." NAF's own form contract therefore acknowledges the foreseeability of reclassification and pre-builds a contractual fallback in the event of reclassification, confirming that the misclassification of Plaintiff was undertaken with knowledge of, not in good-faith ignorance of, the risk.

39A. In addition, NAF's deliberate selection of a restrictive Consulting Agreement template for Plaintiff is evidenced by NAF's contemporaneous use of a clean, project-based Statement of Work template, without the same restrictive covenants, with another California-resident consultant engaged in or about October 2025 to perform CRM/marketing-automation services for NAF. The differential reflects NAF's deliberate selection of the restrictive template for Plaintiff, evidencing NAF's knowledge that the relationship with Plaintiff was structured to misclassify under California law.

40. NAF at no time provided Plaintiff with itemized wage statements as required by Labor Code §226(a). All payments were transmitted via wire transfer without accompanying statements showing gross wages earned, total hours worked, applicable deductions, net wages earned, employer name and address, pay period dates, or hourly rates — none of which were ever provided.

41. NAF at no time reimbursed Plaintiff for necessary business expenses incurred in direct consequence of the discharge of his duties, including but not limited to: (a) Sentry.io error-monitoring service ($120 documented); (b) AI development tools and related services used in creating NAF's platform (including Claude AI and Cursor IDE), to the extent not reimbursed by NAF; and (c) hosting and database services for NAF's production environment, including Vercel and Supabase, to the extent Plaintiff personally incurred those costs. The precise amounts, and the allocation of payment among accounts, are to be established through discovery, including account records and card statements, and proven at trial.

42. On information and belief, and specifically identified pursuant to Federal Rule of Civil Procedure 11(b)(3) as likely to have evidentiary support after a reasonable opportunity for investigation and discovery, NAF's misclassification of Plaintiff was not an isolated incident. NAF's organizational structure — in which a California-barred attorney serving as CLO drafted and maintained an independent contractor agreement containing employment-characteristic provisions for a worker who was given a C-suite title, company email, and mandatory meeting schedule — suggests a systematic approach to classifying

(DSRx)

workers as independent contractors to avoid employer obligations under California law.

42A. Plaintiff alleges on information and belief that NAF's misclassification of Plaintiff is part of a pattern or practice of systematic misclassification of similarly-situated workers engaged by NAF or by Defendant Mitchey on form contracts.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION: BREACH OF WRITTEN CONTRACT

### (Against Defendant NAF)

43. Plaintiff realleges and incorporates by reference all allegations set forth above as though fully set forth herein.

44. On or about May 2, 2025, Plaintiff and NAF entered into a written Consulting Agreement requiring NAF to pay Plaintiff $200 per hour for services rendered.

45. Plaintiff performed all conditions, covenants, and promises required of him under the Agreement, or was excused from performance. Plaintiff substantially

performed his obligations under the Agreement, in good faith and without willful departure from its terms; to the extent any performance remained, he was excused by NAF's prevention and by NAF's failure to give the written cure notice required by Section 4. See *Connell v. Higgins*, 170 Cal. 541, 556 (1915); CACI No. 312.

46. NAF breached the Agreement by failing and refusing to pay Plaintiff $12,400 in compensation for services rendered, despite demand. Section 4 of the Agreement expressly requires that upon termination, "Consultant shall be paid for any portion of the Services that have been performed prior to the termination." NAF has failed to pay any portion of Plaintiff's final compensation.

47. NAF further breached the Agreement by issuing the February 5, 2026 cease and desist letter declaring Plaintiff in breach and threatening immediate legal action without first providing the 15-day written cure notice required by Section 4 of the Agreement. The C&D itself constituted the first written notice of any alleged breach by Plaintiff; it provided no cure window, terminated the Agreement immediately, and demanded return of all $101,761 in prior compensation paid by NAF over the engagement. NAF therefore breached its own contractual procedure for declaring breach by Plaintiff.

48. As a direct and proximate result of NAF's breach, Plaintiff has suffered damages in the amount of $12,400, plus prejudgment interest at the legal rate.

## SECOND CAUSE OF ACTION: FAILURE TO PAY FINAL WAGES; WAITING TIME PENALTIES

### (Lab. Code §§201, 202 Against NAF; Lab. Code §203 Against NAF and Mitchey Pursuant to §558.1)

49. Plaintiff realleges and incorporates by reference all allegations set forth above.

50. As alleged herein, Plaintiff was an employee of NAF within the meaning of the California Labor Code.

51. Pursuant to Labor Code §202, an employee who quits employment is entitled to receive final wages within 72 hours of resignation, or immediately if the employee has given at least 72 hours' prior notice of intention to quit.

52. Plaintiff resigned on January 28, 2026. NAF has failed to pay Plaintiff any final wages as of the date of this First Amended Complaint.

53. Pursuant to Labor Code §203, if an employer willfully fails to pay wages due upon termination, the employee's wages continue as a penalty from the due date at the same rate until paid or until an action is commenced, not exceeding

30 days. NAF's failure to pay was willful within the meaning of §203 because NAF intentionally failed and refused to pay wages it knew were due; "willful" requires only that the failure be intentional, not that it be accompanied by any wrongful or evil purpose. See *Gonzalez v. Downtown LA Motors, LP*, 215 Cal. App. 4th 36, 54 (2013). The §203 penalty accrues even where the wages are later paid. See *Pineda v. Bank of America, N.A.*, 50 Cal. 4th 1389 (2010). NAF cannot establish a good-faith dispute excusing the penalty: a defense is not asserted in good faith where it is unsupported by the evidence, unreasonable, or presented in bad faith. See Cal. Code Regs., tit. 8, §13520; *Choate v. Celite Corp.*, 215 Cal. App. 4th 1460, 1468 (2013); *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157 (2008). NAF's Chief Legal Officer is a California-licensed attorney charged with knowledge of the standard governing employee classification under the Labor Code; the parties' CIIAA itself contemplated that Plaintiff might be reclassified as an employee; NAF never provided the notice of void contractual provisions required by Business and Professions Code §16600.1; and the asserted dispute over Plaintiff's work product was raised only after Plaintiff demanded payment, as alleged in Paragraph 89. NAF's non-payment was therefore neither reasonable nor in good faith.

54. Plaintiff's contractual rate of compensation was $200 per hour. Pursuant to Labor Code §203, Plaintiff is entitled to waiting-time penalties calculated at his

daily rate of pay, continuing for up to 30 days, in an amount to be proven at trial. The §203 penalty is computed at Plaintiff's daily rate of pay multiplied by the number of days the wages remained unpaid, up to thirty days. See *Mamika v. Barca*, 68 Cal. App. 4th 487, 493 (1998). NAF is not entitled to offset against these wages any sum it claims Plaintiff owes. See *Barnhill v. Robert Saunders & Co.*, 125 Cal. App. 3d 1, 6 (1981). California's wage protections apply to Plaintiff irrespective of his rate of pay and extend to highly compensated employees. See *Davis v. Farmers Ins. Exchange*, 245 Cal. App. 4th 1302, 1331 (2016).

55. Defendant Mitchey is individually liable under California Labor Code §558.1 as a person acting on behalf of NAF who, through his executive authority, exercised control over Plaintiff's wages, hours, and working conditions and who directed, authorized, and participated in the failure to pay Plaintiff's final wages. Mitchey, as CEO and co-founder of a startup with fewer than ten employees, personally controlled all financial decisions, personally executed each of the wire transfer payments to Plaintiff throughout the engagement, and personally determined whether and when Plaintiff would be paid. In contemporaneous text messages, Mitchey repeatedly confirmed his personal role in payment timing, including by writing: "I have the invoice and will fire off the payment this week" (May 21, 2025); "Wire was sent this

morning" (May 21, 2025); "I didn't forget about you. Wire and recap email will be over tonight or tomorrow" (November 11, 2025); "Sent another wire. It's before 3 so should show up today" (November 13, 2025); and "I'll make it priority Monday morning, thanks for the heads up" (January 17, 2026). On January 9, 2026, Mitchey expressly directed Plaintiff to route invoices through Seeley, writing: "Ashley is handling all invoicing/payments now. Can you put together an invoice and I'll run it all by her." That direction confirms Mitchey's personal control over wage payment up to the point of his explicit delegation, and confirms that Seeley thereafter acted in her executive capacity over wage decisions, not as outside counsel. On February 4, 2026, Plaintiff texted Mitchey directly requesting payment of outstanding wages, stating he would miss rent; Mitchey did not respond, and the next day Seeley sent the retaliatory C&D rather than processing payment. Seeley, as NAF's Chief Operating Officer, personally denied Plaintiff's requests for timely payment on two separate occasions despite Plaintiff's disclosure of resulting financial hardship, and exercised executive authority over the decisions affecting Plaintiff's wages, hours, and working conditions. Defendants' conduct satisfies the standard articulated in Usher v. White, 64 Cal. App. 5th 883, 896-97 (2021), and Espinoza v. Hepta Run, Inc., 74 Cal. App. 5th 44, 58-60 (2022), that an officer or managing agent is individually liable under §558.1 where they were

personally involved in the violation or had sufficient participation in the activities of the employer such that the officer may be deemed to have contributed to or had oversight or influence on corporate policy that resulted in Labor Code violations. Unlike the owner in Usher who was uninvolved in the specific classification decisions and granted summary judgment on that ground, Mitchey personally participated in the creation, finalization, and operationalization of the Consulting Agreement misclassifying Plaintiff and personally exercised authority over Plaintiff's wage payments, and Seeley, as NAF's officer and agent, exercised executive authority over the wage-payment decisions, satisfying the "personally involved" / "sufficient participation" standard in operative force. An officer, director, or managing agent who causes a Labor Code violation is personally liable under §558.1 notwithstanding the corporate form, and may be held personally responsible for the unpaid wages, the civil penalties, and the employee's attorney's fees. See *Atempa v. Pedrazzani*, 27 Cal. App. 5th 809 (2018) (individual who causes wage violations personally liable for civil penalties and the employee's attorney's fees; corporate form no shield); *Seviour-Iloff v. LaPaille*, 80 Cal. App. 5th 427 (2022) (officer personally liable under §558.1 for unpaid wages).

THIRD CAUSE OF ACTION: FAILURE TO FURNISH ITEMIZED

WAGE STATEMENTS

(Lab. Code §226 — Against Defendant NAF)

56. Plaintiff realleges and incorporates by reference all allegations set forth above.

57. Labor Code §226(a) requires employers to furnish each employee, semi-monthly or at the time of each payment of wages, an accurate itemized statement in writing showing: (1) gross wages earned; (2) total hours worked; (3) applicable deductions; (4) net wages earned; (5) the inclusive dates of the pay period; (6) the name and address of the employer; (7) the employee's name and last four digits of the social security number; and (8) all applicable hourly rates and the number of hours worked at each rate.

58. NAF knowingly and intentionally failed to furnish Plaintiff with any itemized wage statements during the entirety of his employment. No statement meeting any of the requirements of §226(a) was ever provided. NAF's failure was knowing and intentional: NAF furnished no wage statement of any kind, and its Chief Legal Officer, a California-licensed attorney, knew or should have known that itemized wage statements were required. NAF held no objectively reasonable, good-faith belief that it was furnishing compliant wage statements

(DSRx)

and therefore cannot avoid penalties under §226(e). See *Naranjo v. Spectrum Security Services, Inc.*, No. S279397 (Cal. May 6, 2024).

59. Pursuant to §226(e), Plaintiff is entitled to recover the greater of actual damages or statutory penalties of $50 for the initial violation and $100 for each subsequent violation, up to an aggregate penalty of $4,000, plus costs and reasonable attorney's fees.

60. Plaintiff is entitled to statutory penalties up to the cap of $4,000 pursuant to Labor Code §226(e), in an amount to be proven at trial based on the applicable pay periods. NAF designated no pay-period schedule for Plaintiff, and the relevant unit under §226(e) is pay periods worked rather than payments received. To the extent the applicable pay-period frequency is determined to be biweekly or more frequent over the approximately nine-month engagement, Plaintiff's statutory penalties approach or reach the $4,000 statutory cap.

## FOURTH CAUSE OF ACTION: FAILURE TO REIMBURSE BUSINESS EXPENSES

### (Lab. Code §2802 — Against Defendant NAF)

61. Plaintiff realleges and incorporates by reference all allegations set forth above.

62. Labor Code §2802(a) requires an employer to indemnify an employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties. The employer's duty to indemnify under §2802 is non-waivable; any agreement purporting to shift necessary business expenses onto the employee is void. See Lab. Code §2804; *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937 (2008).

63. During the course of his employment, Plaintiff incurred necessary business expenses that NAF failed to reimburse, as set forth in Paragraph 41 above. The precise amount of Plaintiff's unreimbursed expenses is to be established through discovery and proven at trial.

64. Pursuant to §2802(c), a prevailing employee is entitled to recover reasonable attorney's fees and costs.

**FIFTH CAUSE OF ACTION: UNFAIR BUSINESS PRACTICES**

(Bus. & Prof. Code §17200 et seq. — Against NAF and Mitchey)

65. Plaintiff realleges and incorporates by reference all allegations set forth above.

66. Business and Professions Code §17200 prohibits any "unlawful, unfair, or fraudulent business act or practice."

(DSRx)

67. Unlawful Prong: Defendants' conduct constitutes "unlawful" business practices because it violates: (a) Labor Code §§201 and 202 (failure to pay final wages); (b) Labor Code §203 (waiting time penalties); (c) Labor Code §226 (failure to furnish wage statements); (d) Labor Code §226.8 (willful misclassification of an employee as an independent contractor); (e) Labor Code §2802 (failure to reimburse expenses); (f) Labor Code §98.6 (retaliation); and (g) Business and Professions Code §16600 (enforcement of void non-competition clause); (h) Business and Professions Code §16600.5 (attempted enforcement of a contract void under §16600); and (i) Business and Professions Code §16600.1, which required NAF to provide written notice to Plaintiff that the non-competition and non-solicitation provisions are void, the violation of which constitutes an act of unfair competition.

68. Unfair Prong: Defendants' misclassification scheme is "unfair" because it was designed to: avoid employer obligations including payroll taxes, workers' compensation insurance, and unemployment insurance; deny Plaintiff protections of the California Labor Code; and shift employer costs (expenses, tools, hosting) onto Plaintiff.

69. By misclassifying Plaintiff as an independent contractor, Defendants avoided employer obligations including the employer share of payroll taxes, federal and state unemployment insurance, and workers' compensation

premiums. These avoided obligations evidence Defendants' financial motive for, and the willful and knowing character of, the misclassification.

70. As a result of Defendants' unlawful and unfair business practices, Plaintiff is entitled to restitution of all amounts wrongfully withheld and to injunctive relief pursuant to §17203. Plaintiff has standing under Business and Professions Code §17204 because he has lost money or property — including the unpaid wages and unreimbursed business expenses to which he has a cognizable claim — as a result of Defendants' unlawful and unfair business practices. See *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011).

70A. Plaintiff has no adequate remedy at law for the equitable relief sought under this cause of action. The injunctive relief sought — to restrain NAF's continuing and prospective enforcement and assertion of the void restrictive covenants and its ongoing unlawful and unfair business practices — is prospective in nature and cannot be redressed by an award of legal damages, which are retrospective and would not prevent the continuing and future harm. Any restitution sought under this cause of action is sought in the alternative to, and only to the extent it is not duplicative of, the legal remedies available under Plaintiff's wage-based causes of action.

71. Defendant Mitchey is individually liable under §17200 as a person who personally directed and participated in the unlawful and unfair business

practices alleged herein, including by personally recruiting Plaintiff, assigning the CTO title and company email, introducing Plaintiff to external partners as "NAF's CTO," requesting Plaintiff serve as "fractional CFO" on partner calls, directing Plaintiff's daily work including urgent platform tasks, and personally processing and withholding wage payments — all while maintaining the independent contractor classification.

72. The unlawful and unfair business practices alleged herein were carried out by NAF through its officers and agents, including its Chief Legal Officer Ashley C. Seeley, whose conduct in drafting and maintaining the classification scheme and denying Plaintiff's wage payment requests was undertaken on NAF's behalf and is imputed to NAF. Defendant Mitchey's individual liability under § 17200 is alleged in Paragraph 71 above.

## SIXTH CAUSE OF ACTION: DECLARATORY RELIEF

(Bus. & Prof. Code §16600; CCP §1060 — Against Defendant NAF)

73. Plaintiff realleges and incorporates by reference all allegations set forth above.

74. An actual controversy has arisen and now exists between Plaintiff and Defendant NAF concerning their respective rights and duties under the Consulting Agreement.

75. The Agreement and accompanying CIIAA contain multiple provisions restricting Plaintiff's ability to engage in business activities competitive with NAF, to solicit NAF's employees, consultants, or customers, and to influence NAF's clients. The during-engagement non-competition provision (Section 8 of the Consulting Agreement) appeared in Plaintiff's original Clerky template draft. The CIIAA (Exhibit D), provided by NAF in the executed version, contained additional 12-month post-engagement non-solicitation and customer non-interference restraints that did not appear in Plaintiff's original draft.

76. Business and Professions Code §16600 provides: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." California enforces §16600 strictly: absent a statutory exception, a contractual restraint is void, including a provision that operates as a de facto restraint such as an overbroad non-solicitation or confidentiality covenant. See *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946-950 (2008); *AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.*, 28 Cal. App. 5th 923, 935-940 (2018); *Brown v. TGS Management Co.*, 57 Cal. App. 5th 303, 316-319 (2020).

77. Plaintiff is a California resident. The work at issue was performed in California. During contract negotiations, NAF unilaterally inserted Colorado as the choice-of-law jurisdiction into a previously blank template field in Plaintiff's original Clerky template draft, deliberately selecting a non-California jurisdiction. Regardless of any choice-of-law provision in the Agreement, California Labor Code §925 provides that an employer shall not require an employee who primarily resides and works in California to agree to a provision that would deprive the employee of the protections of California law, including §16600.

78. Plaintiff seeks a judicial declaration that (a) the during-engagement non-competition provision in Section 8 of the Consulting Agreement; (b) the 12-month post-engagement non-solicitation and customer non-interference provisions in Section 8 of the CIIAA (Exhibit D to the Consulting Agreement); and (c) the "Notice to Third Parties" provision in Section 7 of the CIIAA, which requires Plaintiff to disclose his CIIAA obligations to any future business partner or employer during the Restriction Period and authorizes NAF to notify third parties of those obligations, are void and unenforceable under §16600, and that Plaintiff is free to engage in any lawful business activity, including agricultural lending and related technology services, without obligation to disclose the void provisions of the CIIAA to third parties.

79. A judicial declaration is necessary and appropriate because NAF's C&D letter asserts rights under the Agreement that Plaintiff contends are void, creating an actual controversy regarding Plaintiff's right to compete.

## SEVENTH CAUSE OF ACTION: RETALIATION

(Lab. Code §98.6 — Against NAF and Mitchey)

80. Plaintiff realleges and incorporates by reference all allegations set forth above.

81. Labor Code §98.6(a) provides that no person shall discharge, threaten to discharge, demote, suspend, or in any manner discriminate or retaliate against any employee or applicant for employment because the employee has made a written or oral complaint that he or she is owed unpaid wages. The statute's broad prohibition against retaliation "in any manner" encompasses post-separation retaliatory conduct, including threats of legal action designed to coerce a former employee into abandoning valid wage claims.

82. At the time of the retaliatory conduct, Plaintiff remained functionally within the employment relationship. Although Plaintiff submitted his resignation on January 28, 2026, NAF directed Plaintiff to perform a multi-day "Development Handover" process, during which Plaintiff performed approximately 24 hours

of additional transition work at NAF's direction through early February 2026. The retaliatory C&D was sent on February 5, 2026, while Plaintiff was still performing work at NAF's direction and before Plaintiff had been paid for any of this transition work.

83. Plaintiff repeatedly asserted his wage claim before the C&D was sent. Plaintiff first requested payment of outstanding wages in connection with his January 28, 2026 resignation. On February 4, 2026, Plaintiff texted Defendant Mitchey directly, expressly requesting payment of outstanding wages and informing Mitchey that the delay would cause Plaintiff to miss rent. Mitchey did not respond. The very next day — February 5, 2026 — Seeley, acting on behalf of NAF, sent Plaintiff a retaliatory cease and desist letter — serving as evidence of NAF's retaliatory intent — that: (a) falsely accused Plaintiff of "sabotage"; (b) accused Plaintiff of violating the federal Computer Fraud and Abuse Act, a criminal statute; (c) demanded the return of all $101,761 paid by NAF over the engagement, including amounts paid to Plaintiff's spouse and to a third-party vendor that Plaintiff did not personally receive; and (d) sought to intimidate Plaintiff into abandoning his wage claim. The temporal proximity between Plaintiff's direct wage demand and the C&D is one day.

84. On February 6, 2026, Plaintiff responded with a written demand for $15,600 in outstanding compensation. NAF refused to engage or pay.

85. The adverse action underlying this claim is Defendants' non-communicative conduct: Defendants refused to pay Plaintiff's earned, unpaid final wages and withheld the compensation owed to him after, and because of, his protected complaints that he was owed unpaid wages. The February 5, 2026 cease-and-desist letter is alleged not as the actionable retaliatory act, but as evidence of Defendants' retaliatory intent, which the following further demonstrate: (a) it was sent in direct response to Plaintiff's assertion of his right to be paid for work performed; (b) it fabricated accusations of sabotage using language NAF's CEO had previously used as a joke; (c) it invoked the federal Computer Fraud and Abuse Act, a criminal statute, over a 2.5-hour accidental disruption that caused zero damage; (d) it demanded return of nine months of lawful compensation; (e) NAF has never pursued any of the threats contained in the C&D, confirming they were made in bad faith to pressure Plaintiff into forfeiting his wages; (f) the C&D's accusations of "materially deficient" work product were directly contradicted by Seeley's own contemporaneous executive communication to X-Caliber, NAF's most significant lending partner, only weeks earlier, in substance, praising Plaintiff's work as "pretty spiffy"; and (g) the C&D's "materially deficient" framing was further contradicted by Defendant Mitchey's own contemporaneous text-message acknowledgment of the platform's commercial success on January 17, 2026 — eighteen days before

the C&D — when Mitchey wrote to Plaintiff: "The good news…apps are rolling in tho!" Withholding the earned, outstanding wages of a worker who depends on them — the day after he complained that they were owed — is a materially adverse action, judged on the totality of the employer's conduct and by whether it would dissuade a reasonable worker from asserting his rights. See *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028 (2005); *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006). Because the gravamen of this claim is Defendants' non-communicative withholding of wages, and not any litigation communication, the litigation privilege does not bar it. See *Rusheen v. Cohen*, 37 Cal. 4th 1048 (2006). Defendants' assertion of a counterclaim demanding return of all $101,761 paid — lacking a reasonable basis and advanced with retaliatory motive — independently constitutes a further adverse action. See *Darveau v. Detecon, Inc.*, 515 F.3d 334 (4th Cir. 2008).

86. Even if the Court were to find that Plaintiff's employment had terminated before the C&D was sent, Section 98.6's prohibition against retaliation "in any manner" extends to post-employment retaliatory acts. The retaliatory intent formed during the employment relationship, and the C&D was designed to punish Plaintiff for exercising his statutory right to demand unpaid wages. To hold otherwise would create a perverse incentive for employers to wait until an

employee separates before retaliating for protected wage complaints made during employment.

87. Pursuant to Labor Code §98.6(b)(3), Plaintiff is entitled to recover lost wages and work benefits, including interest, as well as appropriate equitable relief and penalties.

88. Defendant Mitchey is individually liable as the CEO who approved and directed the retaliatory conduct. Mitchey was personally copied on the C&D email, establishing his knowledge and approval of the retaliatory communication. Mitchey originated the characterization of Plaintiff's conduct as "sabotage" in an October 8, 2025 text message ("Corporate sabotage lol"), which Seeley subsequently incorporated into the C&D as a formal legal accusation. On February 4, 2026 — the day before the C&D was sent — Plaintiff texted Mitchey directly requesting payment of outstanding wages; Mitchey did not respond, and the C&D was sent instead. Ms. Seeley authored and sent the C&D on NAF's behalf and at Mitchey's direction, and her conduct in doing so is imputed to NAF.

89. The February 5, 2026 cease-and-desist letter further demonstrates Defendants' retaliatory intent and the absence of any good-faith basis for the non-payment. The C&D was sent at approximately 12:30 a.m., copied Plaintiff's spouse, invoked the federal Computer Fraud and Abuse Act, a

criminal statute, against Plaintiff over a 2.5-hour permission change to an account Plaintiff personally owned, and demanded the return of all $101,761 paid by NAF over nine months of accepted work — including amounts paid to Plaintiff's spouse and to a third-party vendor that Plaintiff did not personally receive — the day after Plaintiff informed Defendant Mitchey that the delay in payment would cause him to miss rent. The C&D's accusation that Plaintiff's work product was "materially deficient" was directly contradicted by Ms. Seeley's own contemporaneous communication to NAF's most significant lending partner, X-Caliber, only three weeks earlier — in the presence of Plaintiff, Defendant Mitchey, and X-Caliber personnel — praising the same work, in substance, as "pretty spiffy." Defendants thus acted with knowledge that the accusations were false, confirming that the non-payment was retaliatory and not the product of any good-faith dispute.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

**On the First Cause of Action (Breach of Contract):**

(a) Compensatory damages in the amount of $12,400;

(b) Prejudgment interest at the legal rate from the date each payment became due;

**On the Second Cause of Action (Unpaid Wages / Waiting Time Penalties):**

(c) Unpaid final wages in the amount of $12,400;

(d) Waiting time penalties pursuant to Labor Code §203, at Plaintiff's daily rate of pay for up to thirty days, in an amount to be proven at trial;

**On the Third Cause of Action (Wage Statement Violations):**

(e) Statutory penalties up to the cap of $4,000 pursuant to Labor Code §226(e), in an amount to be proven at trial based on the applicable pay periods, plus costs and reasonable attorney's fees;

**On the Fourth Cause of Action (Unreimbursed Expenses):**

(f) Reimbursement of all necessary business expenses pursuant to Labor Code §2802, in an amount to be proven at trial;

**On the Fifth Cause of Action (Unfair Business Practices):**

(g) Restitution of all amounts wrongfully withheld from Plaintiff;

(h) Restitution pursuant to Cal. Bus. & Prof. Code §17203 of all sums wrongfully withheld from Plaintiff as a result of Defendants' unlawful and unfair business practices, in an amount to be proven at trial;

(i) Injunctive relief, including an order enjoining Defendants from any further attempt to enforce the void restrictive covenants against Plaintiff, and such other injunctive relief as the Court deems just and proper;

**On the Sixth Cause of Action (Declaratory Relief):**

(j) A judicial declaration that the during-engagement non-competition provision in Section 8 of the Consulting Agreement, the 12-month post-engagement non-solicitation and customer non-interference provisions in Section 8 of the CIIAA (Exhibit D to the Consulting Agreement), and the "Notice to Third Parties" third-party-disclosure provision in Section 7 of the CIIAA, are void and unenforceable pursuant to Business and Professions Code §16600;

(k) A judicial declaration that Plaintiff is free to engage in any lawful business activity;

**On the Seventh Cause of Action (Retaliation):**

(l) Lost wages and work benefits, including interest, pursuant to Labor Code §98.6(b)(3);

(m) Appropriate equitable relief and penalties;

(n) Reasonable attorney's fees pursuant to Labor Code §§226(e), 2802(c), and any other applicable statute;

(o) Costs of suit incurred herein;

(p) Pre-judgment and post-judgment interest as allowed by law;

(q) Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

# VERIFICATION

I, William Kasel, am the Plaintiff in this action. I have read the foregoing First Amended Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on ___June 30_____, 2026, at Hermosa Beach, California.

_____

William Kasel, Plaintiff Pro Se

946 3rd Street

Hermosa Beach, CA 90254

(415) 818-6348

wkasel@gmail.com